## PROOF OF INTENT TO KILL.

[Circuit Court of Lucas County.]

JOHN MUNDAY V. STATE OF OHIO.*

Decided, December 2, 1904.

*Criminal Law—Trial for Homicide—Proof of Intent to Kill—Necessary to Justify Conviction of Murder in the Second Degree—No Conclusive Presumption from the Striking of the Fatal Blow—Charge of Court—Self-Defense.*

1. In order to justify a conviction of murder in the second degree it must be affirmatively proved that the accused "purposely" killed the deceased; to show that he purposely inflicted the wound that caused the death, or that he purposely struck the deceased, from which stroke the deceased died, is not sufficient. It follows, therefore, that it is error to charge the jury to the effect that, if the proof shows that defendant "purposely" committed the act, the natural and probable consequence of which was to and did cause the death of the deceased, evidence on behalf of the defendant tending to show that he did not in fact intend to kill the deceased is immaterial.

2. The presumption that one intended the natural and probable consequences of his own act can not be extended in its application to justify a charge to the jury, under an indictment for murder in the second degree, that defendant is presumed to have intended to kill the deceased because he purposely inflicted the act which caused the death.

3. In such a prosecution, where it is claimed that the defendant acted in self-defense and does not admit any intent to kill, a charge that "no other ground of justification or excuse than self-defense is claimed by the defendant, and no other will be considered by you" tends to exclude the right of the defendant to reduce the grade of the offense charged from murder in the second degree to manslaughter, and is prejudicial error.

HULL, J.; PARKER, J., and HAYNES, J., concur.

Error to Lucas County Common Pleas Court.

The plaintiff in error was indicted for the crime of murder in the second degree, and was convicted of that offense by the jury. A motion for a new trial being overruled, he was sen-

* Affirmed by the Supreme Court, 2 O. L. R., 509.

tenced to imprisonment in the penitentiary for life. A petition in error was filed in this court to reverse that judgment.

John Munday, in the fall of 1889, was married to Lillie Munday, the person he was charged with killing. They were married at the city of Detroit. The killing is alleged to have occurred on January 13, 1893, in the city of Toledo.

It is claimed that the court erred in its charge to the jury; that the verdict was against the weight of the evidence; and that therefore the court erred in overruling the motion for a new trial.

As I have said, Munday was married to Lillie Munday in Detroit in 1889. After their marriage, they moved to Toledo and lived on Wisconsin street, he having two or three children by a former wife and one by Lillie Munday. A day or so after January 15, 1893, now over eleven years ago, it was noticed by the neighbors and the relatives of Mrs. Munday that she had disappeared from their home on Wisconsin street. Her mother and some of the neighbors came to the house and inquired where she was, and Munday told them she had gone away—they had been separated for a short time, prior to this—he told them she had gone away, and he did not know where she was. Soon after that he with his children left the house and moved to Detroit, and went to other places, and finally to St. Louis.

In June, 1895, nearly two years and a half after Mrs. Munday had disappeared, her body was found under the house where they had lived on Wisconsin street, in Toledo. It had decomposed so that only a portion of the skin on the face and neck remained; it was identified fully by those who knew her and was examined by physicians. The only mark of violence that could be discovered by the physicians at that time, if this was a mark of violence, was a small hole on one side of her neck through the skin which still remained about the size of an ordinary lead pencil, or a man's little finger, or a thirty-eight caliber bullet, as one physician testified; but no one could tell how the hole had been made or whether the skin had simply decomposed; the flesh inside was all gone. The body had been

put under the house through the floor, the boards being lifted in a closet.

A warrant was issued for Munday and soon after that he was arrested in St. Louis and brought back to Toledo, in the same month, June, 1895. In the following August, he escaped from the jail of Lucas county and fled, and lived at various places, and married another woman; and, finally in the year 1903, he was found in the city of St. Louis, working on the exposition buildings, was arrested and brought back to Toledo. He had been indicted for murder in the second degree. The case was tried in the court of common pleas at the April Term, 1903—ten years after Mrs. Munday disappeared. At the trial of the case the evidence offered by the state showed the finding of the body under the house, the marks upon it—it had the mark upon it which I have referred to—and there was some testimony as to the statements of Munday, that is, his statement that she had gone away and that he did not know where she was, and the evidence of an officer, by the name of Durian, that Munday had said to him that he had had a quarrel with his wife and a struggle and that in the struggle he had struck her with the handle of a carving knife; and that she had died; that he had tried to resuscitate her, but could not; that he had come near to the police station two or three times with the intention of giving himself up, but his courage failed and he ran away. That statement, it was claimed, was made at the time he was first arrested, ten years before. This is a brief statement of the state's case; some elements I have probably left out.

The only witness who claims to have been present at the time of Mrs. Munday's death was the defendant himself. He went on the witness-stand and his claim was that whatever he did was done for the purpose of defending himself. He claimed that they had various quarrels; that she was a woman of violent temper; and he was corroborated in this to some extent. On this occasion Munday claimed she was about to leave and take with her their little girl, who was then a small child; that

he undertook to prevent her taking the girl; that he began taking a coat off the child; that thereupon she attacked him first with the broom; that he took it away from her and threw it out of the room, and at the same time put out the two small children who were in the room with them—they were in the dining-room—and closed the door; that thereupon she picked up a carving knife which was on the dining-room table and threatened to kill him, "to fix him," "to run the knife through him," and used other language of that kind. Munday claimed that he ran around the dining-room table, she pursuing him; that she finally gained on him, with the carving knife in her hand, which he says was a long knife, a knife with a long blade and a long, pointed handle. When she came near him he claims that he whirled, and, for the purpose of protecting himself, struck her on the breast with his hand or fist and knocked her down. He says she was still raving, as he put in, in a raging, angry, threatening manner, with the knife still in her hand. In order to get the knife away from her, to make her let go of the knife, he said he took hold of her hand; that the knife which she held in her right hand was transferred to the other hand; she was still threatening to kill him; that in the struggle with her he got the knife away from her by rubbing his knuckles against her fingers—the fingers of the hand which held the knife. He said also that in the struggle he took hold of her throat and choked her some.

He says that he finally succeeded in getting the knife away from her. Soon after that, he says, she became unconscious. Why she became unconscious he claims he does not know. He laid her upon the couch in the room; the only blood that he says he saw was at the back of her head. He says he tried to resuscitate her with camphor, and put his hands on the back of her head to staunch the blood; but he was unable to resuscitate her. In the course of an hour he found she was dead, and he says that he took the body and laid it on the bed in the front room of the house; that he went down town intending to report it to the police, but he said his courage failed and he did not.

The door of the front room where the body lay was locked. He told the small children that Mrs. Munday had gone away. The body remained there, according to his statement, until the next night at midnight, when he concluded to flee; and he took up the boards in the floor of a closet and put the body under the house—the house stood on stone piers, and was surrounded with boards; there was no cellar under the house. Soon after that, a day or two after, Munday went to Detroit, and after that came his experiences and wanderings, as I have already stated, until he was finally arrested and put on trial.

As stated, his claim is that whatever he did was done in self-defense. He does not admit that he intended to kill his wife, and if what he says is true, he probably did not; at least, he does not admit that he did. He denies having used any weapon upon her or any kind of violence except as before stated. He claims that in the struggle she cut him on one of his arms near the wrist.

It is urged that the court erred in its charge to the jury; and especially in the instructions as to what would be sufficient to establish the crime of murder in the second degree. This crime is defined in Section 6810, Revised Statutes, as follows:

"Whoever purposely and maliciously, except as provided in the last two sections, kills another, is guilty of murder in the second degree, and shall be imprisoned in the penitentiary during life."

It will be observed by reading the statute that to constitute this offense, the killing must have been done purposely and maliciously, and, under the law of this state, the element of purpose and intent must be proven and established by the state beyond a reasonable doubt. It is as much an element of the crime as the killing itself. It is not all unlawful homicides that are murder, either in the first or second degree. Manslaughter is defined in Section 6811, Revised Statutes, as follows:

"Whoever unlawfully kills another, except as provided in the last three sections, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty years nor less than one year."

The burden is upon the state to establish every material element of the crime charged. As appears on page 50 of the record the court charged the jury:

"The burden is also upon the state to satisfy you beyond a reasonable doubt that the said Lillie Munday died as the direct and probable result of an act purposely inflicted upon her by the said defendant. The word 'purposely,' as used in the statute to characterize the act, has no relation to the motive with which the act is committed. Motive is no element of homicide, and need not be proved. 'Purposely' means on purpose, intentionally, and as used in this connection relates to the intent with which the act is done. That is to say, the act which results in the death of another must have been done with the intent to kill. The intent with which an act is done is to be determined from the nature of the act, the circumstances surrounding and attending it, and all the facts of each particular case."

So far no special complaint is made of the instruction, and it seems to state the law correctly. The court then continues:

"It constitutes no excuse or defense for one charged with the commission of homicide, to say that he did not intend to kill his victim, for every person is presumed to intend the natural and probable consequences of every act voluntarily and willfully done by him.

"Therefore, if you are satisfied beyond a reasonable doubt that the said defendant purposely inflicted upon said 'Lillie Munday an act, the natural and probable consequences of which was to and which actually did cause her death, it is no justification, excuse or defense for him to say that, in doing such act, he did not intend to kill the one against whom it was exerted."

So that the court charged in substance, in the last paragraph which I have read, that if the defendant purposely inflicted upon Lillie Munday an act, the probable consequences of which was to cause her death and which actually did cause her death, it was no justification or excuse or defense for him to say that in the doing of it he did not intend to kill the one against whom it was exerted.

As appears from the statute, and as has been held by the Supreme Court of this state, one of the necessary elements of

the crime of murder in the second degree is an intent to kill at the time the fatal blow is struck. There must be an intent and purpose on the part of the defendant to take the life of the person assailed. This is to be shown by the evidence and from all the facts and circumstances of the case. If he uses a deadly weapon, that may be strong evidence of the intent; if he shoots or stabs, that may be strong evidence of an intent and purpose to kill; but one defense which the defendant may make to the charge of murder, either in the first or second degree, is that he did not in fact intend or purpose to kill the person whose death has been caused.

It is the murderous intent that gives to the offense the grade of murder rather than manslaughter; and the defendant may show all the facts and circumstances and leave it to the jury to say whether he intended to kill or not. He may be asked— I do not think that was done in this case—whether he intended to kill or not, and he may say, if it be true, that he did not. And the trend of Munday's testimony in this case was that he did not intend to kill his wife. He had, he claims, in his hand, after he had taken it from his wife, a deadly weapon which he says he did not use. He denies the use of any weapon upon her, or doing anything except to strike her with his fist, and what he did in the struggle to get the knife away from her; so the question of intent was fairly in the case, whether he struck or did what he did with intent to kill her. As is said by some authorities, where the killing is wholly unexplained, where there is no evidence except the fact that one has killed another, the presumption is that it was done intentionally and is murder in the second degree. But that rule does not prevail where the facts and circumstances are laid before the jury by one witness or more who claims to have been present at the time of the killing. In *Jones* v. *State*, 51 Ohio St., 331, in the fourth paragraph of the syllabus this is said:

"An intention to kill is an essential element of the crime of murder in this state, and must be established beyond a reasonable doubt, to authorize a verdict of murder in the first or second degree. This rule is not changed by reason of the accused

contending, and introducing evidence tending to prove, that the homicide was accidental. The legal effect of such evidence being simply to controvert an inference of an intent to kill, which may arise from the evidence introduced by the state.''

On page 341 of the opinion, delivered by Judge Bradbury, this is said:

"The statutes of Ohio make an intent to kill an essential ingredient of the crime of murder, in either degree, except in the case of death following from maliciously placing obstructions on a railroad track, etc.  (Sections 6808, 6809, 6810, Revised Statutes).  The intent or purpose, to kill, being an essential constituent of the offense, should be averred and proven (*Fouts* v. *State*, 8 Ohio St., 98; *Kain* v. *State*, 8 Ohio St., 306; *Hagan* v. *State*, 10 Ohio St., 459).  This purpose, like every other material averment of the indictment, is put in issue by the plea of not guilty and to authorize a conviction must be proven beyond a reasonable doubt.''

And on page 343:

"We are not called upon at this time to declare what presumptions might arise, and their effect, from the mere fact that one person had killed another, wholly unexplained by any evidence of attending circumstances; for, in the case before us, the homicide was committed in the presence of a number of persons, each of whom gave to the jury his version of the affair.''

In this case a father was indicted for murder in the first degree for killing his son, was twice convicted in the common pleas court and the judgment reversed in the circuit court, and this was the third judgment that was then before the Supreme Court.  Jones had a gun, which he had taken with him when he left his house to go, as he claimed, to rescue his son from a bawdy house and the society of bad women, and he shot and killed his son with this deadly weapon.  He claimed that he did it accidentally; that he did not intend to shoot his son; and the Supreme Court held that putting in that defense or plea that he did it accidentally was only controverting or meeting the case of the state, upon which was the burden of estab-

lishing beyond a reasonable doubt that he intended and purposed to kill his son.

The instruction to the jury in the case at bar that "if they found that the defendant purposely inflicted upon the said Lillie Munday an act, the natural and probable consequences of which was to, and which actually did cause her death, it is no justification, excuse or defense for him to say that in doing such act he did not intend to kill the one against whom it was exerted," etc., was erroneous. It is not the act that must be purposely done, but there must be the purpose to kill. This question has been passed upon we think by the Supreme Court in *Hagan* v. *State,* 10 Ohio St., 459. The court say:

"An averment that the accused 'purposely and of deliberate and premeditated malice' 'did strike' the deceased, thereby inflicting a mortal wound of which the deceased afterward died, does not satisfy the requirements of the law; for though the accused may have purposely and maliciously struck the deceased, it does not follow that the stroke was given with a design to produce death."

Two cases in point upon this question are: *Fouts* v. *State,* 8 Ohio St., 98, where it is said:

"*Intent or purpose to kill,* although not essential to constitute murder at common law, is made one of the *ingredients* of the crime of murder by the statute of Ohio."

And *Kain* v. *State,* 8 Ohio St., 306, 307, where the court say:

"In an indictment for murder, under the statute of this state, it is necessary to aver the *purpose to kill;* such purpose being an essential element of the crime, as defined by the statute.

"An averment, merely, that the accused 'purposely and of deliberate and premeditated malice, did strike, penetrate and wound' the deceased, 'giving to him * * * one mortal wound,' and that the deceased, 'of the mortal wound aforesaid died,' is not sufficient; the 'purpose' being predicated of the assault and wounding, but not of the killing."

As the court say in this case our statute changes the rule of common law. This instruction of the trial court was incorrect.

In *Bailus* v. *State*, 16 C. C., 226, which was decided by this court in 1898, this question is discussed. Bailus killed a man in a house of prostitution in this city with a knife. In the struggle he stabbed him, inflicting wounds from which he died. The court charged the jury as follows:

" 'When one person assaults another violently with a dangerous weapon, likely to kill, and not in self-defense, or in defense of habitation, property or person, and not in a sudden heat of passion caused by provocation apparently sufficient to make the passion irresistible or involuntary, and the life of the party thus assaulted is destroyed in consequence of such assault, then the legal and natural presumption is that death or great bodily harm was intended, and in such case the law implied malice, and such killing would be murder.' "

The court say, Judge Parker delivering the opinion, page 535:

"We think that this language is subject to the construction that, where the circumstances of death, produced by the use of a deadly weapon, are such as to raise a presumption that either death or great bodily harm was intended, the killing would be murder; and this because a deadly weapon was used; indeed we do not think this is fairly open to any other construction. We are of the opinion that this is erroneous. A jury might find from the circumstances in a given case, where death resulted from the use of a deadly weapon, that the intent of a person using such weapon was to wound and not to kill. Manifestly it is error to charge that in such a case the killing would be murder."

This case was a stronger one than the case at bar, for in *Bailus* v. *State, supra,* a knife was used by the defendant, with which he stabbed the deceased to the heart.

Another case decided by this court is the case of *Bennett* v. *State,* 10 C. C., 84. The plaintiff in error killed a man in a saloon in Sandusky, also, by stabbing him, as in *Balus* v. *State, supra.* He claimed he did it in self-defense. He was found guilty of murder in the second degree. The court say in the syllabus in that case:

"To authorize a verdict of murder in the second degree, it must be affirmatively shown by the state that there was at the

time the blow was given an intent existing in the mind of the accused to kill the person whose life was taken; and that he not only delivered the blow with intent to kill, but did it maliciously.''

The opinion of the court was delivered by Judge Haynes, and on page 139, he says:

''The burden of proof is upon the state to show from all the circumstances, clearly and beyond a reasonable doubt, that there was a purpose in the mind of this young man to kill—a formed purpose as much as thought he said to himself: 'I strike you now, and I do it with the intention of killing you.' ''

Another portion of the charge complained of is found on page 51 of the record, where the court said:

''We now come to the consideration of the words 'legal justification or excuse,' as applied to the claim made on behalf of the defendant that, if that which he did resulted in the death of the said Lillie Munday, he was justified therein, and is excused from the consequences thereof, because that which he did do was done in self-defense. No other ground of justification or excuse is claimed by the defendant, and no other will be considered by you.''

It may be true and probably was true that the only complete defense offered by the defendant, or what would be regarded as a full defense was that he did this in self-defense; but yet there was in the case all the time the question what grade of crime he was guilty of, if any; whether guilty of murder in the second degree, or guilty of manslaughter, if guilty of homicide of any degree, and we are of the opinion that this instruction standing unexplained by itself was misleading and ought not to have been given to the jury. It would impress them with the idea that the only question in the case that might be considered to reduce the grade of the offense was, whether he did what he did in self-defense. The court said to the jury: ''No other ground of justification or excuse is claimed by the defendant, and no other will be considered by you.'' While, as I say the only complete and full defense or excuse that the defendant made was that of self-defense, this instruction seems

to exclude the right of the defendant, if he could, to reduce
the grade of the offense charged against him from murder in
the second degree of manslaughter by showing that he did not
intend to kill. We are of the opinion that this charge should
not have been given to the jury in this form.

The court said to the jury as found on page 52 of the record:

"The defendant is guilty of murder in the second degree,
if you are satisfied beyond a reasonable doubt:

"First. That on or about January 5, 1893, in the county of
Lucas and state of Ohio, the defendant inflicted an act upon
the said Lillie Munday which resulted as a direct and proxi-
mate cause in producing or accelerating her death.

"Second. That said act was intentionally inflicted by the
said defendant, and was such that the natural and probable
consequence thereof was to and actually did produce or ac-
celerate her death."

This instruction, in our judgment, was erroneous. It again
omits the essential element of the crime of murder in the second
degree, that Munday must have intended or purposed to kill
his wife.

The effect of this charge was, that if the jury found that
Munday purposely inflicted an act that caused his wife's death,
and the natural and probable consequences of the act would
cause death, that this is conclusive that he is guilty of murder
in the second degree, regardless of what his intent actually was
when he committed such act. We do not think any presump-
tion of law of this kind arises. It is true that a man is pre-
sumed to intend as a general rule, the natural and probable
consequences of his acts. But the defendant is not conclu-
sively presumed, upon a charge of murder in the second de-
gree, to have intended to kill the deceased, because he pur-
posely inflicted an act which did in fact cause death, and
which the jury might say would probably cause death. The
jury may have concluded from the evidence that the blow of
the fist upon Lillie Munday's breast was sufficient to cause her
death. It was claimed that she was suffering from heart dis-
ease and had been for some time; and that that had something
to do with her death, and might have caused it.

The jury may have concluded that the blow upon her breast in the condition of her health was sufficient to kill her, and did kill her. Munday did purposely strike her on the breast, but it was for the jury to say whether, when he struck her on the breast with his fist he did that with an intent to kill her; and no presumption of law would arise from those facts, that he had such intent or purpose at the time he struck her.

Some other parts of the charge do not meet with our entire approval, but we find no other reversible error in it; we have considered the question of the weight of the evidence, but as the case goes back for a retrial we will not discuss that question further than to say that we find no other error in the record.

For the errors in the charge which have been pointed out, the judgment is reversed, the verdict set aside and the case remanded for a new trial.

*J. R. W. Cooper* and *Frank Mulholland,* for plaintiff in error.

*W. G. Ullery,* Prosecuting Attorney, and *J. S. Martin,* Assistant Prosecuting Attorney, for defendant in error.